(C. D. 1101)

TECHNICAL CHARTS, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 22, 1948)

*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Howard L. Harawitz*, special attorney), for the defendant.

Before TILSON, KINCHELOE, and LAWRENCE, Judges

LAWRENCE, Judge: Plaintiff imported into the United States from Toronto, Canada, a shipment invoiced as: "One set (right and left side) punches and dies for use on printing press exclusively consisting of the following materials: Approx. 6 lbs. tool steel in punches and die plates with carbon .90; manganese 1.15; chromium .50; tungsten

.50; balance in gray cast iron and machine steel and bronze." Duty was assessed by the collector of customs at the rate of 25 per centum ad valorem under paragraph 372 of the Tariff Act of 1930 as to the punches, and at 60 per centum ad valorem on the dies under the provision in paragraph 352 of said act for—

\* \* \* cutting tools of any kind containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium \* \* \* .

Plaintiff raises no question in its protest as to the correctness of the classification of the punches under paragraph 372 but does challenge the decision of the collector that the dies are properly dutiable under the above-quoted provision of paragraph 352. It is plaintiff's contention as to the dies that they are properly dutiable at 25 per centum ad valorem under paragraph 372 of said act as parts of printing machinery, or, alternatively, at 27½ per centum ad valorem under the same paragraph as parts of machines, not specially provided for.

In support of its claim, plaintiff offered the testimony of one witness and various illustrative exhibits depicting the articles under discussion and a sample of the work they perform.

The following is a summary of the testimony:

Plaintiff is engaged in printing paper charts for recording instruments. Illustrative exhibit 1 is a photograph of a machine of which the imported articles are parts and said machine consists of four units, namely, a printing unit, a perforating unit, a numbering unit, and a slitting unit. Illustrative exhibit 2 is a photograph of the perforating unit of which the dies in controversy form a part. Illustrative exhibit 3 is a photograph of cutting tools identical with the imported articles. Collective illustrative exhibit 4 represents the charts which are the end products of the printing operation. The witness stated that the two punch and die sets are placed on opposite sides of the printing press and perforate holes on both sides of the charts as they are fed through the press. Each set consists of a male (punch) and female (die) part, the paper being in between. The punch goes through the paper into the female part thereby making a clean-cut hole.

It was agreed between counsel for the respective parties that "the imported article contains more than two-tenths of one percent of tungsten and chromium."

On cross-examination the witness testified that while the presence of of tungsten and chromium in the steel which makes up the punch and die sets would strengthen the unit, the form of these punches is such that they could not be used to cut metal. There is not enough clearance. The witness agreed with the definitions of "printing press" and "printing machine" as contained in Webster's New International Dictionary, Second Edition, 1943, and stated that a perforating operation is not a

function which would be included within the scope of the work performed by a printing press or printing machine in accordance with the definitions read to him but that "in my job it is." He further stated that it would be possible to perforate the charts by a separate and independent process from the printing operation but that by such process it would be a difficult task to produce a chart which would work properly in a recording instrument. The witness stated that plaintiff-corporation also makes charts that do not have perforations, in which event the perforating unit of the printing machine is thrown out of action and the printing unit would function without it.

We do not consider as tenable the doubt raised by plaintiff in its brief that the dies in issue do not contain the tungsten or chromium content required by paragraph 352, *supra*. While admitting its concession at the trial that "the imported article contains more than two-tenths of one percent of tungsten *and* chromium," counsel for plaintiff now calls the court's attention to the requirement of the paragraph that the dies contain "more than two-tenths of 1 percent of tungsten, molybdenum, *or* chromium." [Italics supplied.]

We set forth from the record the agreement of counsel made at the hearing—

Mr. Harawitz: Will you concede that the imported article contains more than two-tenths of one percent of tungsten and chromium?

Mr. Tompkins: Yes.

Judge Mollison: The concession was as to what metal?

Mr. Harawitz: Chromium and tungsten, more than two-tenths of one percent, under paragraph 352.

It would seem clear from the above quotation that there was a mutual understanding and agreement of the parties that the chromium or tungsten requirement *under paragraph 352* was met. There would seem to have been no reasonable ground for the agreement except for the purpose of meeting one of the requirements of said paragraph 352. Moreover, the decision of the collector of customs carries with it the presumption that the dies did contain more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium.

Furthermore, with reference to this agreement of counsel, there may be considered as some evidence the tungsten and chromium content shown on the invoice accompanying the entry covering the importation in question; namely, "chromium .50; tungsten .50". It was stated by our appellate court in the case of *United States* v. *Wo Kee & Co.*, 21 C. C. P. A. (Customs) 341, T. D. 46880, that—

Invoice descriptions of imported merchandise in cases like the one at bar are admissions against interest and are presumptively correct. When such admissions are contradicted by a protest, however, the importer is not precluded from disproving the correctness of such description.

In the case before us, we do not consider as disturbed the presumptive correctness of the invoice description but rather that it has been

confirmed by the agreement of counsel at the hearing of the case, and by the decision of the collector.

Directing our attention first to the contention of the plaintiff that the dies in controversy are parts of printing machinery, it is noted that this claim is not pressed in plaintiff's brief "because it developed upon the trial that the chart printing press, can be and sometimes is used for printing charts without holes, and when so used, the second or punching unit, marked 1B on Illustrative Exhibit 1 is thrown out of gear."

What constitutes a "part" of a machine was clearly defined by our appellate court in the case of *Peter J. Schweitzer (Inc.)* v. *United States*, 16 Ct. Cust. Appls. 285, T. D. 42872. It was there stated—

So it may be said that whether an article is an accessory or an integral part of a machine depends, to a considerable extent, upon its use. If its use is casual, auxiliary, or optional, it is an accessory. If, however, it is used as an essential part, and if the machine is incapable of performing its ordinary and proper functions without it, it will be considered, at least for tariff purposes, as an integral part of the machine.

It is obvious from the record in the case before us that plaintiff has failed in its proof that the dies in issue are integral parts of chart-printing machinery and that the machine would be incapable of performing its ordinary and proper functions without them. Therefore, the claim of plaintiff for classification of the dies as parts of printing machinery dutiable at 25 per centum ad valorem under paragraph 372 of the Tariff Act of 1930 is overruled.

It may be observed, however, that even if the dies were parts of printing machinery, paragraph 352, *supra*, specifically provides that—

* * * The foregoing rates shall apply whether or not the articles are imported separately or as parts of or attached to machines, * * *.

Our next consideration is whether the articles in issue are parts of machines, not specially provided for, under said paragraph 372, and therefore dutiable at 27½ per centum ad valorem. It is plaintiff's contention that the dies are parts of punching or perforating machines other than those covered by the specific provision in paragraph 372 for—

* * * punches * * * intended for use in fabricating structural or other rolled iron or steel shapes * * *.

Such claim cannot be sustained, however, in view of previous rulings of this and our appellate court in the cases referred to *infra*, and which are decisive of the issue here raised.

In *Underwood-Elliott Fisher Co.* v. *United States*, 64 Treas. Dec. 347, T. D. 46666, this court had before it the question of the proper classification of an importation of various articles including punches and dies. The punches and dies had evidently been considered by the collector of customs to be entireties; namely, dies, and had been

classified under the provisions of paragraph 352, *supra*. The court there decided that the punches and dies were separate entities, and were so recognized by Congress, each being *eo nomine* provided for in the Tariff Act of 1930, the punches within the purview of paragraph 372, and the dies under the provision therefor in paragraph 352.

Also worthy of note is the case of *United States* v. *Urdika Wire Die Works*, 19 C. C. P. A. (Customs) 182, T. D. 45292, involving drawing dies containing more than six-tenths of 1 per centum of tungsten, used in drawing wire, the object of the operation being to reduce the diameter of the wire. The articles were classified by the collector under the provisions of paragraph 398 of the Tariff Act of 1922 (predecessor to paragraph 352, Tariff Act of 1930), which reads as follows:

Twist drills, reamers, milling cutters, taps, dies, and metal-cutting tools of all descriptions, not specially provided for, containing more than six-tenths of 1 per centum of tungsten * * * 60 per centum ad valorem.

It was plaintiff's contention in that case that since the dies there involved were not used for cutting metal but for drawing wire they did not come within the scope of paragraph 398, *supra*. In its opinion in that case, our appellate court stated—

It therefore appears that the tungsten content of certain articles was the primary consideration in the enactment of paragraph 398, and accordingly there was just as much reason for including dies of the character here in question as there was for including cutting dies.

The tungsten content of the steel enables it to retain its hardness, and it would seem that this quality is desirable in a wire-drawing die.

Were we to give the construction to paragraph 398 contended for by appellee we would eliminate from its provisions many dies containing tungsten which we are convinced Congress intended to include. Therefore, if a consideration of the legislative history of paragraph 398 were necessary to our decision in this case, it indicates that Congress used the word "dies" therein without limitation (other than that of the tungsten content) designedly, and that it intended that all dies of every kind containing the designated amount of tungsten should fall within its provisions unless specially provided for.

and added—

It is unnecessary for us to pass upon the question of whether the dies involved are parts of machines, because, assuming that they are such, they are more specifically described in paragraph 398. Paragraph 372, under which the dies were found dutiable by the court below, makes no reference to tungsten. Furthermore, dies containing more than six-tenths of 1 per centum of tungsten are not elsewhere provided for in the Tariff Act of 1922.

Paragraph 398 of the Tariff Act of 1922 quoted earlier in this opinion was re-enacted and expanded as paragraph 352 of the Tariff Act of 1930 which reads as follows:

Twist and other drills, reamers, milling cutters, taps, dies, die heads, and metal-cutting tools of all descriptions, and cutting edges or parts for use in such tools, composed of steel or substitutes for steel, all the foregoing, if suitable for use in cutting metal, not specially provided for, 50 per centum ad valorem;

cutting tools of any kind containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium, 60 per centum ad valorem. The foregoing rates shall apply whether or not the articles are imported separately or as parts of or attached to machines, but shall not apply to holding or operating devices.

The case of *Henry Pels & Co., Inc.* v. *United States*, 71 Treas. Dec. 242, T. D. 48817, arose under paragraph 352, *supra*. The collector of customs had classified thereunder an importation consisting of knives and blades, reducing couplings, punches, and dies. Plaintiff claimed the articles were properly dutiable under the provisions of paragraph 372 for "punches, shears, and bar cutters, intended for use in fabricating structural or other rolled iron or steel shapes," or as parts of machine tools, or as parts of machines, not specially provided for.

After a detailed consideration of the legislative history of paragraph 352, *supra*, this court stated—

We have here set out somewhat at length the representations made before the congressional committees, and the alleged matters sought to be remedied by statutory changes, merely to show that both the domestic and importing interests were apparently in agreement that a higher duty should be exacted on cutting tools made of high-speed steel, thus leaving intact the like legislative will in the premises as expressed in the Tariff Act of 1922 and as reflected in the present law.

But that obvious intention would be circumvented were we to hold as sound the view taken by the plantiff. That contention in effect is that all metal-cutting tools, named and unnamed in the paragraph, should be dutiable at the lower rate if composed of steel or substitutes therefor, even though the constituent metal contains in the prescribed percentages the alloys mentioned in the second half of the paragraph.

We believe that such a conclusion would be negatived if not actually precluded by the words "cutting tools of any kind." That expression would seem to be all-comprehensive of the particular kind of cutting tools therein described. It does not read "other cutting tools of any kind." It excludes no cutting tool which meets its requirements as to constituent material. Metal-cutting dies of steel so alloyed are just as surely covered thereby, as are metal-cutting dies of unalloyed steel covered by the first provision. There is, therefore, no competition between the two provisions. Each contemplates separate and distinct classes of articles. Dies covered by the first are not the dies covered by the second, and *vice versa*. The arrangement is not disturbed because in one instance some names are mentioned while in the other they are omitted. None the less must the named articles pay the higher rate if the constituent material contains the specified alloys. That is the determinative test of classification under the second provision. And by the same token the named classes of metal-cutting tools, when constructed of such alloyed steel, must also pay the higher rate. Such we hold to be the clearly expressed will of the lawmakers.

The court accordingly held that the knives and blades, reducing couplings, and punches were properly dutiable under the provision in paragraph 372 for "punches, shears, and bar cutters  *  *  *," and that the dies were correctly classified by the collector under the provisions of paragraph 352 at 50 per centum ad valorem or 60 per centum ad valorem, depending upon their constituent materials.

Of like import is the opinion of this court in the case of *Lionel Corporation et al.* v. *United States*, 71 Treas Dec. 736, T. D. 48952, where the court had before it a question as to the proper classification of certain importations of dies. Duty had been assessed thereon under the provisions of paragraph 352, *supra*, at either 50 or 60 per centum ad valorem, depending upon their composition. Plaintiffs there submitted claims under five alternative provisions of the Tariff Act of 1930, the one of interest to us here being the claim for classification of the dies under paragraph 372 as parts of machines, not specially provided for.

Directly applicable to the case before us are the following quotations from the opinion of this court in the *Lionel Corporation* case, *supra:*

As we read its congressional history, the legislative purpose in framing paragraph 352 of the present law was to extend its scope far beyond the limits of its predecessor paragraph in the 1922 act. The first part of paragraph 352 names certain metal-cutting tools, and then provides for metal-cutting tools of all descriptions, imposing thereon a duty of 50 per centum ad valorem. The second half, which is completely independent of the first, fixes a rate of 60 per centum ad valorem on "cutting tools of any kind containing more than * * * two-tenths of 1 per centum of tungsten * * *." Therefore, while the first half is limited to unalloyed tools which cut metal, the second covers all cutting tools which contain the prescribed percentages of the named alloys.

and—

Therefore, even were it here established, which it is not, that the articles in question were parts either of punches or of machines not specially provided for, inasmuch as they are unquestionably dies they would be more specifically provided for in said paragraph 352, as classified by the collector. See *Henry Pels & Co., Inc.* v. *United States*, T. D. 48817.

The court there overruled all claims of the plaintiff and the classification by the collector of the dies under the provisions of paragraph 352, *supra*, was affirmed.

In view of the fact that dies of various kinds have been held to be separate entities specially provided for, either as "dies" or as "cutting tools of any kind," and that said provisions were more specific than that for parts of machines, not specially provided for (*Urdika Wire Die Works* and *Lionel Corporation* cases, *supra*), the claim of the plaintiff herein for classification of the articles here in controversy under the provisions of paragraph 372, *supra*, for parts of machines, not specially provided for, is overruled.

Plaintiff also argues in its brief:

1. That the dies are not cutting tools *per se*.

2. That Congress intended paragraph 352 to apply only to cutting tools which are designed and suitable for work on metal.

We do not regard either of these claims as being meritorious.

The context of paragraph 352 fairly refutes such claims. By reference thereto, it will be seen that after providing for " * * * dies, * * * and metal-cutting tools of all descriptions, * * * all the foregoing, if suitable for use *in cutting metal*, not specially provided for," there is a provision for—"* * * cutting tools *of any kind* containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium." [Italics supplied.] Only by a strained and unnatural construction of the paragraph could it be reasoned that it is intended "to apply only to cutting tools which are designed and suitable for use on metal," as contended by plaintiff. We do not believe that the language of paragraph 352 is susceptible of such a construction.

That Congress intended paragraph 352 to apply only to metal-cutting tools, as urged by plaintiff, is negatived by the excerpts above quoted from the *Urdika Wire Die Works, Henry Pels & Co., Inc.,* and *Lionel Corporation* cases, *supra,* which establish that the determinative test is whether the cutting tools contain the designated amount of the named constituent materials.

Moreover, in answer to the suggestion of plaintiff that "the dies are not cutting tools *per se,"* it may be pointed out that the definition of the word "die" contained in Funk and Wagnalls Standard Dictionary, 1942 edition, reads as follows:

* * * 3. A hard metal former or device for shaping, impressing, *or cutting out,* * * *. [Italics supplied.]

Neither are we impressed by plaintiff's argument based upon legislative history, which was fully considered and adequately disposed of in cases discussed, *supra.*

In view of the foregoing considerations, we are clearly of the opinion that none of the claims of plaintiff can be sustained. We accordingly overrule the protest in all respects and affirm the decision of the collector of customs.

Judgment will be entered accordingly.